**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION**


| | | |
|---|---|---|
| **LINDA CLEGHORN** | ) | |
| | ) | |
| **v.** | ) | **No. 2:05-0130** |
| | ) | **Judge Wiseman/Bryant** |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security**[1] | ) | |


To: The Honorable Thomas A. Wiseman, Jr.**,** Senior Judge


## REPORT AND RECOMMENDATION


This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff disability insurance benefits (DIB) and Supplemental Security Income (SSI) payments, as provided under Title II and Title XVI of the Social Security Act, as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. (Docket Entry No. 13). For the reasons stated below, the Magistrate Judge recommends that Plaintiff's Motion for Judgment be DENIED, and that the decision of the Commissioner be AFFIRMED.

### I. INTRODUCTION

Plaintiff filed her application for SSI on December 14, 1999 (Tr. 382-383) and her application for DIB on December 29, 1999 (Tr. 107-109). Plaintiff alleges that she became disabled

---

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of Social Security on February 12, 2007, and is "automatically substituted" as party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

Case 2:05-cv-00130   Document 20   Filed 04/06/07   Page 1 of 28 PageID #: 71

in December 1999,[2] due to mental problems, including nervousness, panic attacks, and depression, hypertension, allergies, and musculoskeletal impairments, including one deformed finger on the right hand (Tr. 20, 113, 385). These applications were denied initially (Tr. 81-85), upon reconsideration (Tr. 87-88), and again on May 9, 2002, following an administrative hearing (Tr.26-36, 395-427). On June 13, 2002, Plaintiff requested that the Appeals Council (AC) review the May 9, 2002, decision of the Administrative Law Judge (ALJ) (Tr. 37-38). On December 4, 2002, the AC vacated the May 9, 2002, decision and remanded the case to the ALJ for additional development, consultative examinations, and another hearing (Tr. 39-42). Specifically, the AC found that the ALJ's conclusions regarding the Plaintiff's residual functional capacity, in particular the manipulative and fine coordinating maneuvers of the right hand, were not consistent with the evidence of record and as such, there was a lack of substantial evidence to support the conclusion that the Plaintiff could perform her past work as a sewing machine operator. (Tr. 40-41). Therefore, the AC issued a remand order for further evaluation of the claimant's residual functional capacity. (Tr. 40).

Pursuant to the AC's remand order, physical and mental consultative examinations were scheduled for the Plaintiff. (Tr. 19, 72-76). However, she failed to attend the first scheduled and then the rescheduled appointments, without explanation. (Tr. 19, 72-76). Further, the Plaintiff failed to attend the December 4, 2003, hearing before the ALJ. However, Plaintiff's attorney did appear at this hearing, requesting a postponement stating that the Plaintiff had the flu. (Tr. 57, 58).

_____

[2]The original alleged onset date of disability was January 1, 1998. (Tr. 20, 382). However, Plaintiff herself acknowledges, and the record supports, that she was working until at least December 3, 1999. (Tr. 128, 142). As such, in Plaintiff's Motion for Judgment, Plaintiff claims entitlement to a period of disability beginning in December 1999. (Docket Entry 14 at 16).

Plaintiff's attorney was apparently told to submit medical documentation of the Plaintiff's illness, which he failed to do. (Tr. 19). On December 9, 2003, Plaintiff's attorney requested an on-the-record decision, waived the right to a hearing, and submitted additional evidence, specifically the November 26, 2003, deposition of Dr. John Crabtree. (Tr. 61, 62-71). On January 12, 2004, the ALJ issued a second opinion ruling that the Plaintiff was not entitled to a period of disability or disability insurance benefits (Tr. 19-24). The ALJ made the following findings:

1.      The claimant met the disability insured status requirements of the Act on January 1, 1998, the date she stated she became unable to work, and continued to meet them through December 31, 2003, but not thereafter.

2.      The claimant has not engaged in substantial activity since March 19, 1999.

3.      The medical evidence establishes that the claimant has "severe" cervical degenerative disk disease and contracture of one finger of the right hand, and has continuing alcohol abuse.

4.      The subjective complaints are not credible for the reasons stated above.

5.      The claimant has the residual functional capacity to perform the range of light work described above.

6.      The claimant is able to perform her past relevant work.

7.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 23).

On December 5, 2005, the AC affirmed the ALJ's decision (Tr. 7-9). This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD

Plaintiff was born on July 3, 1959, in Putnam County, Tennessee. (Tr. 20, 107). Plaintiff completed the seventh grade, dropping out of school sometime during her eighth grade year. (Tr. 119, 399). Plaintiff can read and write.[3] (Tr. 399-400). Plaintiff has been married and divorced twice and has two children as well as grandchildren she regularly cares for. (Docket Entry 14, Page 3; Tr. 240, 310-311, 366, 367, 382). Plaintiff indicates being the repeated victim of spousal abuse. (Docket Entry 14, Page 3; Tr. 367-368).

In 1993, Plaintiff had an injury involving her *right* hand, which she compressed between two metal rails smashing her fourth finger causing tendon contractures. (Tr. 271). As part of her employment at that time, Plaintiff had been unloading heavy metal rails from a truck when a rail slipped and fell onto her right hand. (Tr. 310).

On August 6, 1998, Plaintiff fractured her *left* wrist after falling down the stairs. (Docket Entry 14, Page 4). Her treating physician, Dr. Richard Williams, treated Plaintiff several times through September 23, 1998, noting that Plaintiff's fracture was healing, there was no evidence of any displacement of the fracture and the distal radius was well preserved. (Tr. 177). As Plaintiff points out in her memorandum, Dr. Williams did restrict Plaintiff to gentle dishwashing but nothing heavy. (Tr. 179). However, it is clear that this restriction was during the course of the fracture treatment, right after Plaintiff's cast was removed. (Tr. 179) At the end of treatment for this injury, Dr. Williams noted that Plaintiff needed to "wean more and more out her splint, wearing it only for more vigorous activities" and that Plaintiff's wrist was nominally tender with minimal swelling (Tr.

---

[3]The grade level at which Plaintiff can read is discussed later in this Report and Recommendation.

177).  Plaintiff failed to attend any of the scheduled appointments with Dr. Williams for treatment

of this injury after September 23, 1998.  (Tr. 176).

On January 5, 2000, Plaintiff presented to Volunteer Behavioral Health Care Systems.  (Tr.

241).  Plaintiff stated she needed treatment for her nerves due to her daughter being on drugs and

leaving her children in the Plaintiff's care,[4] nervousness, irritability, past alcohol and drug issues,[5]

and sleep problems.  (Tr 240).  Further, Plaintiff reported that she has had numerous stays for

alcohol and drug abuse during that last few years[6] and that she still occasionally uses alcohol but

refrains from drug use. (Tr. 241). Plaintiff's "treating professional," Margaret Copeland,[7] estimated

---

[4]Plaintiff reported that she was receiving support for her grandchildren (ages six and three) through DCS and had repeatedly cared for them for relatively long periods of time over the past few years.  (Tr. 240).

[5]Notably, Plaintiff excluded this part of the treatment from the instant motion, stating that Plaintiff presented only for family-related problems, nervousness and irritability.  (Docket Entry 14, Page 6).

[6]The record indicates that Plaintiff has sporadically sought treatment for several anxiety-related disorders, drug and alcohol abuse, as well as sleep problems and other issues.  (Tr. 229-266).  For example, on January 29, 1997, Plaintiff was admitted into Plateau Mental Center for a 4 day medical detox program.  (Tr. 189).  Plaintiff reported a chemical dependancy upon alcohol, cocaine, and opioids.  (Tr. 189). On February 2, 1997, Plaintiff was discharged from the detox program to the New Leaf Recovery Residential Program.  (Tr. 189).  At this residential program, Plaintiff attended several GED sessions, in addition to her counseling sessions and AA meetings.  (Tr. 191).  Plaintiff completed this 14 day program and was discharged, with notes indicating that she was emotionally stable and would begin outpatient treatment.  (Tr. 191).  The record indicates that Plaintiff received sporadic treatment for substance abuse issues from 1996-2000, where Plaintiff would frequently fail to appear at, or would cancel, treatment sessions.  (Tr. 229-266).

[7]It is unclear to the undersigned what educational background and certifications Ms. Copeland has, as the record does not give direct confirmation as to Copeland's credentials.  It is clear, however, from both parties' references that she is not "Dr." Copeland.

5

Plaintiff's Global Assessment of Functioning (GAF) as 55,[8] diagnosing Plaintiff with an anxiety disorder with a past substance abuse history. (Tr. 242).

On February 15, 2000, a consultative psychological evaluation of Plaintiff was conducted by Mark Loftis, a licensed psychological examiner, and reviewed and approved in its entirety by William R. Sewell, Ph.D. (Tr. 267-270). Examiner Loftis opined that Plaintiff "appears to be of average to low average cognitive functioning" and "had some difficulty with simple calculations" and "simple proverb interpretation." (Tr. 268-269). Examiner Loftis rated Plaintiff's current GAF at 70.[9] (Tr. 269). Examiner Loftis also found that Plaintiff was alert, cooperative, had reasonable recall of past events, was able to understand and to respond appropriately to questions, maintained reasonable concentration, and would have no difficulty in managing her own financial matters. (Tr. 268-270). Further, Examiner Loftis indicated that Plaintiff did report symptoms consistent with depression and anxiety, for which Plaintiff indicated she was receiving treatment. (Tr. 269). Examiner Loftis found that Plaintiff reported that she was capable of independent living. (Tr. 267-270). Examiner Loftis concluded that Plaintiff "did not appear to have cognitive limitations that would refrain her from employment." (Tr. 269).

On February 18, 2000, Plaintiff was treated by neurosurgeon, Dr. Joseph A. Jestus, for *right* hand and arm pain and numbness. (Tr. 271-272). The fourth finger of the right hand, as indicated above, had been smashed in 1993 and she had experienced tendon contractures. However, Dr. Jestus noted that Plaintiff did not appear to have intrinsic hand weakness but did have a flexion contracture

---

[8]Denoting moderate psychological symptoms. Diagnostic and Statistical Manual of Mental Disorders IV-TR 34 (4th ed. 2000).

[9]Denoting mild psychological symptoms. Id.

6

of the fourth and fifth fingers of the right hand. (Tr. 271-272). Further, Dr. Jestus noted that reflexes were minimally weakened on the right as compared to the left. (Tr. 271). Plaintiff was given Xanax, Maxide, and Vicodin for her pain. (Tr. 271).

To further develop the record, on March 1, 2000, a consultative physical examination of Plaintiff was conducted by Dr. Donita Keown. (Tr. 274-277). Plaintiff reported to Dr. Keown that she currently had custody of her grandson and granddaughter. (Tr. 274). Further, Plaintiff reported that she had hypertension, which was controlled by medication. (Tr. 275). Dr. Keown noted that Plaintiff's blood pressure was being adequately controlled by medications. (Tr. 275). Dr. Keown opined that there was a full range of motion in the shoulders, elbows, wrists, and hands. (Tr. 276). Dr. Keown also reported that while there was destruction and loss of the tissue of the distal tip of the right ring finger, it was nicely healed and could be extended fully with full flexion and was flexed 40 degrees at rest. (Tr. 276). Dr. Keown concluded that Plaintiff "demonstrates good range of motion in both hands with intact grip strength bilaterally. Also had full range of motion over the cervical, thoracic and lumbar spine. I see no evidence of diminished motor strength in hands, arms or legs...[and Plaintiff] could sit, stand or walk at least 6 hours in an 8 hour day, could routinely lift 10 pounds, episodically lift 20 pounds." (Tr. 276).

On March 8, 2000, Victor Pestrak, Ph.D., a state agency psychologist, opined that the Plaintiff had affective disorders but did not have a severe mental impairment. (Tr. 278-286). The psychiatric evaluation further revealed that the Plaintiff had slight restrictions on her activities of daily living and slight restrictions in maintaining social functioning; that she seldom had deficiencies of concentration, persistence or pace; and, that she had suffered no episodes of decompensation in work settings. (Tr. 285)

7

On March 14, 2000, Plaintiff returned to Dr. Jestus for treatment of her right hand. (Tr. 344). An MRI revealed cervical stenosis at C5-C6 and C6-C7. (Tr. 271-272, 344). Therefore, Plaintiff was referred to Dr. Peter W. Pick, a neurologist, for an electromyogram ("EMG") for additional information. (Tr. 304, 344).

On March 28, 2000, Plaintiff was seen by Dr. Pick, as referred by Dr. Jestus, for an EMG. (Tr. 304). Dr. Pick found that Plaintiff has mild chronic right C5, C7and C8 cervical radiculopathies, which were probably caused by a stretching of the right cervical roots as a result of her 1993 injury. (Tr. 313). Dr. Pick further stated that Plaintiff would have difficulty lifting more than five pounds with her right hand. (Tr. 313). Dr. Pick also stated that if Plaintiff's condition could not be improved by surgery, it may be permanent. (Tr. 313). On April 22, 2000, Dr. Pick, in a supplementary report for the Disability Determination Section based on his one treatment session, stated that Plaintiff has mild weakness (paresis) in her right hand. (Tr. 304). Dr. Pick further stated that Plaintiff had mild difficulty in grasping and in performing manipulative and fine coordinated maneuvers with the right hand. (Tr. 304). Dr. Pick opined that Plaintiff could perform sitting, standing, walking and bending without restrictions. (Tr. 304). Additionally, Dr. Pick stated that Plaintiff could lift, carry, and handle objects with her right hand up to five pounds with timing restrictions throughout an eight hour day. (Tr. 304). Dr. Pick also stated that Plaintiff could perform many work-related physical activities but only those requiring light duties, i.e. no medium or heavy manual labor. (Tr. 304). As to Plaintiff's mental activities, Dr. Pick opined that Plaintiff could understand, remember, and carry out instructions at work and respond appropriately to supervision, co-workers and work pressures. (Tr. 304). Further, Dr. Pick opined that while Plaintiff's mental status was minimally abnormal due to mild chronic anxiety, Plaintiff's daily activities were not

8

restricted due to her mental state nor does it affect her orientation, memory, concentration, attention, or the ability to relate.  (Tr. 304).

On March 31, 2000, Kathleen McCoy, a nurse practitioner, saw Plaintiff for a psychiatric evaluation.  (Tr. 366-369).  Plaintiff felt as if she was "going crazy raising two grandchildren of a daughter who has been involved with drugs, legal problems, violence in the home. . ."  (Tr. 366).  Ms. McCoy diagnosed Plaintiff with bipolar disorder, substance and alcohol abuse, chronic pain, severe domestic and financial stressors, and rated Plaintiff's current GAF at 45.  (Tr. 368).  Ms. McCoy found that Plaintiff could repeat three of three items immediately and in one minute and could spell her name backward, but was unable to subtract by serial sevens or to calculate.  (Tr. 368).

On April 11, 2000, after reviewing Plaintiff's treatment by Dr. Pick and the EMG results, Dr. Jestus opined that surgery had a 75% chance of significant pain relief.  (Tr. 343).  However, Dr. Jestus refused to perform the surgery, which involved a two-level fusion, unless Plaintiff quit smoking two to three packs of cigarettes per day which Plaintiff did not think she could do  (Tr. 343).

On May 8, 2000, James Walker, Ph.D., the third state agency psychologist to review Plaintiff's mental impairments, found that Plaintiff had affective and anxiety related disorders but did not have a severe mental impairment.  (Tr. 317).  Dr. Walker opined that Plaintiff had slight restrictions on her activities of daily living and slight restrictions in maintaining social functioning; that she seldom had deficiencies in concentration, persistence or pace; and that she had suffered no episodes of decompensation in work settings.  (Tr. 324).

On December 20, 2001, Dr. Patsy Ryan, upon request of Plaintiff's attorney, conducted an

evaluative psychological interview, wherein Dr. Ryan diagnosed Plaintiff with chronic posttraumatic stress disorder, recurrent major depressive disorder, and mild mental retardation. (Tr. 375-381, 378). Dr. Ryan found that Plaintiff's IQ scores, according to the Wechsler Adult Intelligence Scale (WAIS), were as follows: Verbal-65, Performance-67, Full Scale-63. (Tr. 377). Further, Dr. Ryan administered the Wide Range Achievement Test (WRAT), with the result that Plaintiff's reading standard score of 70 placed her at a fifth grade level (comparable to the lower end of borderline intellectual functioning) and her math standard score of 52 placed her at a second grade level (comparable to moderately retarded intellectual functioning). (Tr. 377). Dr. Ryan stated that Plaintiff "can do a little mental arithmetic by counting on her fingers but did not seem to recognize the signs needed for the written math." (Tr. 377). Dr. Ryan interpreted these results as placing Plaintiff in the mildly retarded range of intellectual functioning, with weaknesses in functional academic skills and home living. (Tr. 377). Dr. Ryan opined that Plaintiff's concentration is good and she can count money but would need help handling a bank account. (Tr. 377). Dr. Ryan concluded that, "It is difficult to determine whether these limitations are due entirely to retardation or in part to cultural deprivation and amnesias for part of the past. She can learn when someone takes the time to teach." (Tr. 377).

In addition to her treatment assessment as described immediately above, Dr. Ryan also performed a "Clinical Assessment of Ability To Do Work-Related Activities (Mental)" based upon the December 20, 2001, interview. (Tr. 379-381). Dr. Ryan opined that Plaintiff: was limited in her ability to understand and remember because she misunderstands instructions of supervision, but that she can memorize by associating things; was not significantly limited in her ability to sustain concentration and persistence and could remember and carry out simple instructions, sustain routine,

10

and work in coordination with and in proximity to others, but may become explosive off and on; and, was limited in her ability to socially interact and adapt. (Tr. 379-380). Dr. Ryan concluded that Plaintiff had marked restrictions of activities of daily living and maintaining social functioning, frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and repeated episodes of deterioration or decompensation in work or work-like settings. (Tr. 381).

On March 26, 2001, Plaintiff presented to Dr. Alan Drake for a variety of physical ailments (Tr. 351). Plaintiff reported that she had chronic neck problems and that she had seen Dr. Jestus but that she wanted another opinion. (Tr. 351). Plaintiff reported that Dr. Jestus recommended surgery but wanted her to quit smoking first and she "just doesn't want to do that." (Tr. 351). Plaintiff reported that she smokes at least two packs per day and drinks beer on a fairly regular basis. (Tr. 351). Further, Plaintiff said that she does not like to take antidepressants because she was afraid they would make her fat. (Tr. 351). Additionally, Plaintiff reported that a Dr. Chapman in Cookeville had recommended foot surgery. (Tr. 351). Dr. Drake found a full range of motion and good pulses in all distal extremities. (Tr. 351). Dr. Drake concluded with referrals for Plaintiff's foot problems as well as a neurosurgeon for a second opinion on Dr. Jestus' diagnosis. (Tr. 351).

On April 3, 2001, Plaintiff presented to Dr. David Song, who had previously treated Plaintiff in 2000, upon referral from Dr. Drake. (Tr. 350). Plaintiff was treated for various hammer-toe issues, including lesions and corns. (Tr. 350). Dr. Song reported that Plaintiff smelled strongly of alcohol and appeared to intoxicated. (Tr. 350). Dr. Song stated, "Last May we arranged for surgical correction of this deformity at White County Hospital but patient never showed up and never called us or hospital informing that she is not showing up until 2 days ago when Dr. Chapman saw her and

11

then sent patient to us. I told patient that I do not want to do surgery on patient who is showing poor compliance already. . .I am sending this patient back to her PCP, Dr. Drake for referral to other podiatrist who wishes to do surgery on her. . .I also do not want to discuss surgery when patient is intoxicated with alcohol." (Tr. 350, 338-340).

In her disability report, Plaintiff stated that she attends doctors' appointments, does housework, and shops. (Tr. 137, 150). Additionally, Plaintiff stated that she talks on the telephone, sees her sister who takes her to the doctor or the store, and occasionally visits with a girlfriend who comes by her house. (Tr. 137, 151). In her pain questionnaire, Plaintiff stated that she did not take any pain medication at that time (Tr. 136). Plaintiff further stated that a wrist band and wrist brace help with the pain (Tr. 136).

At Plaintiff's first hearing, on January 16, 2001, Plaintiff testified that she felt she did not have to seek additional treatment for her substance abuse and could do it on her own (Tr. 406) and that the only reason she went into treatment on at least one occasion was to "get out of trouble," choosing to seek treatment instead of doing time in jail (Tr. 407-408, 412). Plaintiff further testified that she has mood swings (Tr. 408), that she gets angry easily (Tr. 408), that her hand tingles (Tr. 408-409), that her upper back hurts behind her neck (Tr. 409), that she lost her license in 1993 because of DUI and does not currently have a license (Tr. 411), that she drank alcohol within a month of the hearing (Tr. 411), and that she had previously taken care of her grandchildren while her daughter was in jail (Tr. 416).

Plaintiff's past work history was also discussed at the first hearing. Plaintiff has past relevant work as a sewing machine operator (light and semi-skilled), a plastic molding machine operator (medium and semi-skilled), a janitor (heavy and unskilled), and as a punch press operator (medium

12

and unskilled). (Tr. 114, 142, 402, 412, 413, 417). The classification of this work is based upon the testimony of Dr. Gary Sturgill, a vocational expert (VE). (Tr. 417). The ALJ asked the VE to assume an individual of Plaintiff's age, education, past work experience, and a RFC for light work with a slight decline in grip strength in one upper extremity affecting some measure of gripping, grasping, and fingering. (Tr. 418-419). The VE testified that with the limitations above, the person could return to Plaintiff's past relevant work as a sewing machine operator (Tr. 419-420). The ALJ then expanded the hypothetical to include a right hand dominant individual who could not actively extend digits four and five of the right hand completely, as well as having limited lifting capacity depending upon weight and frequency.[10] (Tr. 420). The VE concluded that this person could do less than a full range of light work but would still be able to do sewing machine operator work. (Tr. 420). Further, the ALJ posed a series of hypothetical nonexertional limitations. (Tr. 421-422). In response, the VE testified that a person with a GAF between 51-60 would not be precluded from performing semi-skilled or skilled work, i.e., Plaintiff's past work. (Tr. 422). Further, the ALJ added that the person would be moderately limited in terms of activities in daily living, mildly limited in terms of interpersonal functioning, moderately limited in terms of concentration, tasks performance, and pace, and moderately limited in terms of adaptation. (Tr. 422-423). The VE stated that a person so limited would not be precluded from Plaintiff's past work. (Tr. 423). The ALJ then added to the hypothetical moderately severe pain, defined as that level of pain intensity which has a significant effect upon a person's ability to concentrate, persist, and to maintain pace. (Tr. 423). The VE concluded this addition would preclude work. (Tr. 424).

---

[10]See Tr. 420 for the detailed listing of lifting restrictions.

13

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

#### B. Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-

14

step sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[11] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id*. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained

---

[11]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

15

through vocational expert (VE) testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423 (d)(2)(B).

## C.  Plaintiff's Statement of Errors

Plaintiff alleges two errors in the ALJ's decision: (1) that the ALJ erred in not finding that Plaintiff's mental impairments met or equaled Listing 12.05C, mental retardation; and (2) that the ALJ's finding that Plaintiff could return to her past relevant work is not supported by substantial evidence.

With respect to Plaintiff's first argument, Plaintiff argues that she is disabled pursuant to Listing 12.05C, which states in relevant part as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in . . . C are satisfied.
>
> C.  A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

As noted above, the burden of proof rests with the Plaintiff through the first four steps of the sequential evaluation process.  The ALJ has a basic obligation to develop a full and fair record. *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051-1052 (6th Cir. 1983).  However,

16

a claimant bears the burden of providing a complete record establishing disability, and the Commissioner is not required to order consultative examinations unless they are necessary for the ALJ to make a disability determination. 20 C.F.R. § 404.1512; *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).

With that said, the ALJ ordered a consultative psychological examination of the Plaintiff, the results of which were subsequently reviewed, along with the rest of the record, by two additional state medical consultants. (Tr. 267-270, 278-286, 317-324). Examiner Loftis opined, and Dr. Sewell concurred, that while Plaintiff "appears to be of average to low average cognitive functioning" and "had some difficulty with simple calculations" and "simple proverb interpretation," Plaintiff "did not appear to have cognitive limitations that would refrain her from employment." (Tr. 269). Examiner Loftis rated Plaintiff's current GAF at 70[12] and found that Plaintiff was alert, cooperative, had reasonable recall of past events, was able to understand and to respond appropriately to questions, maintained reasonable concentration, was capable of independent living, and would have no difficulty in managing her own financial matters. (Tr. 268-270). The two state agency psychologists to review the record, Drs. Pestrak and Walker, opined that Plaintiff had slight restrictions of her activities of daily living, slight restrictions in maintaining social functioning, and

[12]The Magistrate Judge does not address the other GAF scores in the record. The ALJ properly favored the score given by Examiner Loftis, a licensed psychological examiner, whose report was reviewed and approved by Dr. Sewell. (Tr. 270). Ms. McCoy and Ms. Copeland are not acceptable sources of medical evidence. By regulation, relevant to the instant case, an acceptable source of medical evidence is considered to be either a licensed physician, a licensed osteopath or a licensed or certified psychologist. 20 C.F.R. §§ 404.1513(a) and 416.913(a). Ms. McCoy is a nurse practitioner and Ms. Copeland's credentials are unclear upon review of the record. These individuals are thus "other sources" whose opinions "may" be used to show the severity and functional impact of an impairment. 20 C.F.R. §§ 404.1513(d), (d)(1) and 416.913(d), (d)(1). Accordingly, the ALJ did not err in giving weight to the GAF findings of Examiner Loftis.

Case 2:05-cv-00130   Document 20   Filed 04/06/07   Page 17 of 28 PageID #: 87

seldom had deficiencies of concentration, persistence or pace, with no episodes of decompensation in work settings. (Tr. 285, 324). In conclusion, both doctors opined that Plaintiff had affective disorders but did not have a severe mental impairment. Neither made a finding that Plaintiff was mentally retarded. (Tr. 278-286, 317).

Additionally, one of Plaintiff's treating physicians, Dr. Pick, opined that Plaintiff could understand, remember, and carry out instructions at work and respond appropriately to supervision, co-workers and work pressures. (Tr. 304). Further, Dr. Pick opined that while Plaintiff's mental status was minimally abnormal due to mild chronic anxiety, Plaintiff's daily activities were not restricted due to her mental state nor does it affect her orientation, memory, concentration, attention, or the ability to relate. (Tr. 304).

Dr. Ryan, upon request of Plaintiff's attorney, conducted an evaluative psychological interview, wherein Dr. Ryan diagnosed Plaintiff with chronic posttraumatic stress disorder, recurrent major depressive disorder, and mild mental retardation. (Tr. 375-381, 378). Dr. Ryan found that Plaintiff's IQ scores were as follows: Verbal-65, Performance-67, Full Scale-63. (Tr. 377). Further, Dr. Ryan found, using the WRAT, that Plaintiff's reading standard score of 70 placed her at a fifth grade level and her math standard score of 52 placed her at a second grade level. (Tr. 377). Dr. Ryan stated that Plaintiff "can do a little mental arithmetic by counting on her fingers but did not seem to recognize the signs needed for the written math." Dr. Ryan opined that Plaintiff's concentration is good and she can count money but would need help handling a bank account. (Tr. 377). Dr. Ryan concluded that, "It is difficult to determine whether these limitations are due entirely to retardation or in part to cultural deprivation and amnesias for part of the past. She can learn when someone takes the time to teach." (Tr. 377).

18

In his most recent decision, the ALJ found that Plaintiff's reading ability, coupled with her long employment history including semi-skilled work, along with the opinions of Examiner Loftis, Dr. Pestrak, and Dr. Walker, were inconsistent with Dr. Ryan's finding of mild mental retardation or severe mental impairment. (Tr. 21). Accordingly, the ALJ found that Plaintiff did not meet Listing 12.05C.

Plaintiff argues that Dr. Ryan's diagnosis of mild mental retardation along with accompanying IQ scores, Plaintiff's school records, and the various mental evaluations noting Plaintiff's difficulty with simple math and reading, as well as the low GAF scores given by Ms. McCoy and Ms. Copeland, demonstrate mental retardation with an onset before age 22. Additionally, Plaintiff argues that the ALJ improperly rejected the IQ scores and opinion of Dr. Ryan. (Docket Entry 14, Page 12). The Commissioner argues in response, and the ALJ found, that Plaintiff's IQ scores are inconsistent with Plaintiff's current functional abilities and there is no evidence in the record of an onset of mental retardation before age 22.

An ALJ may discount an IQ score as invalid so long as there is substantial evidence in the record to support such a conclusion. *E.g.*, *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991)(citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00B-D).[13] While the empirically

---

[13]Plaintiff relied heavily upon this case where the Sixth Circuit held that a full scale IQ score of 68 was not inconsistent with a disability claimant's functional abilities despite showing that claimant could use public transit, had a driver's license, visited friends, could make change at a grocery store, could do his own laundry and clean his room, completed the sixth grade, and as a truck driver, recorded mileage, the hours he worked, and the places he drove. (Tr. 269-270). The Sixth Circuit relied upon the DSM-III-R § 317.00, which states that those with mild mental retardation, "By their late teens, they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimal self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with mild mental retardation can live successfully in the community, independently or in supervised apartments or group homes

19

uncontradicted IQ scores obtained by a licensed psychologist upon administration of the WAIS are not to be lightly regarded, and would plainly trump the prior findings of no severe impairment by non-examining psychologists, a second IQ test would likely have clarified the validity of Dr. Ryan's assessment, if only the Plaintiff had submitted to a second test. However, when the ALJ on remand ordered additional consultative physical and psychological examinations, the Plaintiff failed to appear without explanation. (Tr. 19, 72-76). These examinations were then rescheduled and Plaintiff again failed to appear without explanation. (Tr. 19, 72-76). Further, as indicated above, the Plaintiff did not attend the second scheduled hearing, allegedly because of having the flu, and did not provide the requested documentation of that illness or any other reason for her failure to appear. (Tr. 19, 57-58). The government cannot be held accountable for the Plaintiff's indifference to her disability claim. Indeed, the regulations provide that if an individual, without good reason, fails to take part in a consultative evaluation, which is arranged by the Social Security Administration to obtain needed information to determine disability, that individual may be denied benefits based solely on that person's lack of cooperation. 20 CFR §§ 404.1518 and 416.918. Under these circumstances, the undersigned concludes that, at a minimum, any error in the ALJ's determination of the Plaintiff's intellectual functioning is mitigated accordingly.

With that said, the ALJ did not base his entire opinion on Plaintiff's failure to take part in ordered consultative examinations. Rather, in both the decision under review (Tr. 20-21) and in his original decision (Tr. 33-34),[14] the ALJ analyzed the additional criteria of Listing 12.05C, beyond

_____

(unless there is an associated disorder that makes this impossible)." *Id*. at 270.

[14]It is noted that the AC did not take issue with this portion of the ALJ's original decision. While the original decision was vacated by the AC, the ALJ aptly noted that the Plaintiff appeared to abandon her argument under § 12.05 in proceedings subsequent to the AC

the IQ criterion, and found that the Plaintiff's level of adaptive functioning both before and after the age of 22 failed to support the existence of mental retardation. Even if the Plaintiff's current IQ scores below seventy were deemed sufficient to establish her "significantly subaverage general intellectual functioning," in order to qualify for benefits under Listing 12.05C, evidence of impairment onset prior to the age of 22 is also required. Again, the Plaintiff has the ultimate burden of proving that she meets the Commissioner's definition of disability. *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993). Evidence that Plaintiff currently functions in the mildly mentally retarded range is insufficient, alone, to demonstrate an onset prior to age 22. None of Plaintiff's testing or evaluation was contemporaneous with her developmental period; she was already 42 years of age when the first testing was performed in 2001. The only contemporaneous evidence in the record pertaining to this issue is Plaintiff's poor performance in, and early exit from, school. Plaintiff herself said that she left school, not because of any mental deficiencies, but when she became pregnant at age 14, after losing interest in school when she discovered boys and "hung with the wrong crowd." (Tr. 33-34, 367). The very limited school records submitted by Plaintiff do demonstrate that when Plaintiff was in sixth grade, she was behind a grade level in nearly every subject. (Tr. 168). However, this can at least partially be attributed to Plaintiff's excessive absenteeism (numbering 302 days absent between grades 3-6) (Tr. 167),

---

remand (Tr. 20), and even in appealing the ALJ's second decision to the AC, when she focused entirely on her alleged satisfaction of the criteria of Listing 1.04 (Tr. 14, 61-71). In any event, this Court's authority to look to any evidence in the record in furtherance of its review for substantial evidence, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001), clearly encompasses a look back to the first ALJ decision under these circumstances. *Cf. Dixon v. Massanari*, 270 F.3d 1171, 1174 (7th Cir. 2001)("Although ALJ Kelly's decision after Dixon's third administrative hearing is the key matter before us, that decision drew on earlier decisions, so all, where pertinent, will be discussed.").

Case 2:05-cv-00130   Document 20   Filed 04/06/07   Page 21 of 28 PageID #: 91

which was noted by the ALJ (Tr. 20).

Moreover, the additional evidence in the record does not demonstrate or support onset of "deficits in adaptive functioning" before age 22. Plaintiff raised her own children, was married before the age of 22 and divorced and remarried thereafter, performed full time semi-skilled work where none of her employers questioned her intellectual abilities, and was capable of performing household chores such as shopping and cleaning, and was further fully capable of independent self-care. (Tr. 21, 34, 150-152, 240, 274, 310-311, 350, 367, 382, 410, 416).

Additionally, the absence of a record of treatment, diagnosis, or even inquiry into mental impairment prior to applying for benefits weighs against the existence of an impairment before the age of 22. As noted by the ALJ in his first opinion, the Plaintiff had, prior to her application for benefits, undergone numerous intake interviews in connection with attempts to begin mental health services or drug and alcohol rehabilitation, and none of these professionals questioned Plaintiff's competency or intellectual functioning.[15] (Tr. 34). Further, Plaintiff's other treating physicians also did not question Plaintiff's competency or intellectual functioning and in fact, one of Plaintiff's treating doctors, Dr. Pick, opined that while Plaintiff's mental status was minimally abnormal due to mild chronic anxiety, Plaintiff's daily activities were not restricted due to her mental state nor did it affect her orientation, memory, concentration, attention, or the ability to relate. (Tr. 304).

Further, Examiner Loftis, Dr. Pestrak, and Dr. Walker seem to agree that Plaintiff is currently of low intelligence but not mentally retarded. Dr. Ryan alone has diagnosed Plaintiff with mild mental retardation, at the age of 42. Further, Dr. Ryan, upon whose opinion Plaintiff has based her

---

[15]In fact, as late as 1997, during the New Leaf Recovery Residential Program, Plaintiff was encouraged to attend, and attended, several GED sessions, in addition to her counseling sessions and AA meetings. (Tr. 191).

22

argument, says herself that, "It is difficult to determine whether [Plaintiff's] limitations are due entirely to retardation or in part to cultural deprivation and amnesias for part of the past. She can learn when someone takes the time to teach." (Tr. 377). On this evidence, it is not a foregone conclusion that Plaintiff is even currently mentally retarded, let alone prior to the age of 22.

While additional testing may have corroborated Dr. Ryan's conclusions, Plaintiff chose not to participate in such testing when she failed, without explanation, to attend the scheduled and re-scheduled consultative examinations.[16] Moreover, the ALJ was not required to go further in attempting to develop the record of Plaintiff's intellectual and adaptive deficits, as he already had an extensive medical history before him and his decision on that record is supported by substantial evidence. The ALJ discussed the evidence in detail to support his findings and amply explained the reasoning, as described above, which supported his determination. Therefore, upon review of the record, the Magistrate Judge believes that substantial evidence supports the ALJ's decision that Plaintiff did not carry her burden of establishing an onset of mild mental retardation prior to the age of 22 as required by Listing 12.05C.

With respect to Plaintiff's second statement of error, Plaintiff argues that the ALJ failed to abide by the remand order of the AC, in particular, "virtually ignor[ing]" the AC directive to conduct further evaluation of the Plaintiff's RFC regarding manipulative and fine coordinating maneuvers involving the right hand. (Tr. 40). However, Plaintiff has failed to address her own failure to attend the scheduled and rescheduled consultative examinations as well as the December 4, 2003, hearing.

---

[16]The Magistrate Judge would have been curious to know from additional evaluations if Plaintiff's extensive history of substance and alcohol abuse could have, in part, caused Plaintiff's current low IQ scores. *Brown*, 948 F.2d at 271. However, for reasons stated above, this determination is not necessary in the instant case given the extensive medical history before the ALJ which supports his decision.

In light of the Plaintiff's own disregard for the administrative process, her allegation of the ALJ's disregard of the AC's directive cannot be sustained.[17]  Further, after the ALJ issued his second opinion, wherein Plaintiff was found to have the RFC to return to her past relevant work, the AC denied Plaintiff's request for review.[18]  As such, the AC ultimately found that the ALJ's decision regarding this matter was supported by substantial evidence.  (Tr. 7-9).

The regulations provide that if the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her RFC (*i.e.*, what the claimant can still do despite his or her limitations). *Moon*, 923 F.2d at 1181.  The Claimant can establish a *prima facie* case of disability by showing a medical condition that prevents him or her from returning to such past relevant work.  *Id*.  In determining RFC, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423 (d)(2)(B).  The Plaintiff limits her objections involving the RFC determination to those involving her right hand injury.  Specifically, Plaintiff contends that she lacks the manipulative and fine motor coordination to return to her past relevant work as a sewing machine operator.  However, as discussed below, the record is replete with medical evidence that Plaintiff's hand weakness is minimal.  Further, the VE testified that even with the right hand limitations assessed by Dr. Pick,

---

[17]As discussed previously, the regulations provide that if an individual fails to take part in consultative evaluations, which are arranged by the Social Security Administration to obtain needed information to determine disability, without good cause, that individual may be denied benefits based solely on that person's lack of cooperation.  20 CFR §§ 404.1518 and 416.918.

[18]As previously noted, *supra* n.14, Plaintiff's counsel was not concerned with the ALJ's alleged misfeasance or Listing 12.05 at any point in the agency proceedings subsequent to the AC remand in December 2002.  (Tr. 14, 61).

the Plaintiff could return to her past work (Tr. 419-20). Therefore, the Magistrate Judge believes that Plaintiff has not met her burden and that the ALJ's decision that Plaintiff's RFC permits her to perform her past relevant work is supported by substantial evidence in the record.

Dr. Jestus noted that Plaintiff did not appear to have intrinsic hand weakness but did have a flexion contracture of the fourth and fifth fingers of the right hand. (Tr. 271-272). Further, Dr. Jestus noted that reflexes were minimally weakened on the right as compared to the left. (Tr. 271). Dr. Keown opined that there was a full range of motion in the shoulders, elbows, wrists, and hands. (Tr. 276). Dr. Keown also reported that while there was destruction and loss of the tissue of the distal tip of the right ring finger, it was nicely healed and could be extended fully with full flexion and was flexed 40 degrees at rest. (Tr. 276). Dr. Keown concluded that Plaintiff "demonstrates good range of motion in both hands with intact grip strength bilaterally. Also had full range of motion over the cervical, thoracic and lumbar spine. I see no evidence of diminished motor strength in hands, arms or legs...[and Plaintiff] could sit, stand or walk at least 6 hours in an 8 hour day, could routinely lift 10 pounds, episodically lift 20 pounds." (Tr. 276). Further, Dr. Drake found a full range of motion and good pulses in all distal extremities. (Tr. 351).

Dr. Pick found, after EMG testing, that Plaintiff has mild, chronic right C5, C7 and C8 cervical radiculopathies, which were probably caused by a stretching of the right cervical roots as a result of her 1993 injury. (Tr. 313). Dr. Pick further stated that Plaintiff would have difficulty lifting more than five pounds with her right hand, had mild weakness (paresis) in her right hand, and had mild difficulty in grasping and in performing manipulative and fine coordinated maneuvers with the right hand. (Tr. 304). Dr. Pick stated that Plaintiff could lift, carry, and handle objects with her right hand up to five pounds with timing restrictions throughout an eight hour day, and could

25

perform light duty work. (Tr. 304-05). Dr. Pick also stated that if Plaintiff's condition could not be improved by surgery, it may be permanent. (Tr. 313).

After reviewing Plaintiff's treatment by Dr. Pick and the EMG results, Dr. Jestus opined that surgery would have a 75% chance of significant pain relief. (Tr. 343). However, Dr. Jestus refused to perform the surgery, which involved a two-level fusion, unless Plaintiff quit smoking two to three packs of cigarettes per day, which Plaintiff did not think she could do, nor did she even "want to do that." (Tr. 343, 351). Plaintiff reported that she smokes at least two packs per day and drinks beer on a fairly regular basis. (Tr. 351).

Lastly, Plaintiff's past work history was also discussed at the first hearing where the VE was questioned thoroughly, including by specific reference to the restrictions listed by the doctors above. Even with these restrictions, the VE found that Plaintiff retained the RFC to return to her past relevant work. (Tr. 418-423). Specifically, the ALJ asked the VE to assume an individual of Plaintiff's age, education, past work experience, and a RFC for light work with a slight decline in grip strength in one upper extremity affecting the measure of gripping and grasping and fingering. (Tr. 418-419). The ALJ then expanded the hypothetical to include a right hand dominant individual who could not actively extend digits four and five of the right hand completely, as well as having limited lifting capacity depending upon weight and frequency.[19] (Tr. 420). Further, the ALJ included a series of nonexertional limitations, specifically an individual with a GAF between 51-60. (Tr. 412-422). Additionally, the ALJ added that the person would be moderately limited in terms of activities of daily living, mildly limited in terms of interpersonal functioning, moderately limited in terms of concentration, tasks performance, and pace, and moderately limited in adaptation. (Tr.

---

[19]See Tr. 420 for the detailed listing of lifting restrictions.

Case 2:05-cv-00130   Document 20   Filed 04/06/07   Page 26 of 28 PageID #: 96

422-423). With all of these additions, the VE stated that this person still would not be precluded from doing Plaintiff's past work. (Tr. 423).

With the above medical expert opinions which demonstrate only mild impairments, if any, regarding Plaintiff's right hand, combined with Plaintiff's failure to follow prescribed treatment without good reason, i.e. surgery after quitting smoking, as well as the VE's testimony and the Plaintiff's failure to attend consultative examinations without explanation, the Magistrate Judge believes that the ALJ's decision that Plaintiff's RFC permits her to perform her past relevant work is supported by substantial evidence in the record.

The Magistrate Judge is sympathetic to Plaintiff's past history of substance addiction and domestic abuse. However, Plaintiff is still physically and mentally capable of working. Substantial evidence supports the ALJ's findings as to Listing 12.05C and Plaintiff's RFC. The fact that there may be substantial evidence in the record to support another conclusion is irrelevant. *Walters v. Commissioner*, 127 F.3d 525, 532 (6th Cir. 1997).

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v.*

27

*Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).


ENTERED this 6th day of April, 2007.


 s/ John S. Bryant        
JOHN S. BRYANT
United States Magistrate Judge

28